0131 St. John's United Church of Christ. I am your host, Joseph Karagannis. I'm going to be our lead, and that's all. Good morning, counsel. Mr. Karagannis. Good morning, procedure. Good evening. May it please the Court, my name is Joseph Karagannis, and I represent the appellants in this case, both what Chicago refers to as the several hundred living relatives, as well as St. John's United Church of Christ. We're here on two areas of constitutional challenge. One is to religion-based constitutional rights, which the circuit court never reached because the circuit court said that the living relatives were barred by the doctrine of res judicata. And the second relates to constitutional limitations that are independent of religious rights, that are limitations of the power of eminent domain. With regard to the religious constitutional rights, we believe Taylor v. Sturgill, a 2008 United States Supreme Court decision, emphasizes that the day in court requirement is of constitutional significance. It is a due process for evidence. Didn't Helen Rundley and St. John's Church provide adequate representation in the federal action? The parishioners shared the same religious beliefs, or the interveners did, as other parishioners in St. John's and with St. John's. At least as to religious claims, why wasn't there adequate representation provided? The Taylor case makes it very explicit that in order to constitute adequate representation, you have to have one of two things. Both the person who claims to be the representative, as well as the person who is supposedly represented, must most agree that indeed there is a representation. There's no evidence of that at all. As a matter of fact, several of the relatives are not parishioners at all. Now Justice Ginsburg doesn't say that specifically in Taylor. Yes, it does in Taylor, and it does as well in nationwide mutual insurance, which comes off of Taylor. So that's a federal case? It's a federal case interpreting Taylor, applying the Taylor doctrine, and emphasizing again that both parties, both the representative as well as the person represented, have got to clearly know and understand that the person represented is that representative. No such evidence exists in this case. So we believe that, number one, the adequate representation doctrine of Taylor and its progeny, federal circuit courts for appeal decisions, racially cannot apply. The second thing is a separate legal relationship, which is mentioned by Taylor, and indeed is emphasized by the amicus for the city of Chicago. So there has to be a legal relationship as opposed to a substantive relationship? The affilee argues a substantive relationship was there. That's not adequate? It's a substantive legal relationship, and I'm going to direct the court's attention to the restatement of judgment second, which the Supreme Court again refers to. And it says the use of the word prudity has been very sloppily used by the courts over time. That's one of the things the Supreme Court criticized. So the restatement says, here's what we mean by prudity, and they're spelled out in the following sections. And one of those sections, Your Honor, is section 54 of the restatement of judgments, which basically says concurrent ownership of property does not constitute the substantive legal relationship, which will justify the imposition of racial denial. So we're very clear here, and it's a case, indeed, cited by the city of Chicago, which says that there is no adequate substantive legal relationship simply by the fact that two people own the same piece of property or have ownership interests in the same piece of property. The trial court granted summary judgment based on the ratio of properties, Your Honor. On the religious constitutional claims, yes, Your Honor. If we determine that there are no material issues of fact, do we have the ability to affirm on a different basis, which is we actually determine what the uncontroverted or uncontested facts are, apply the law as we see it, and then either affirm or reverse? Well, Your Honor, if you were to go to the religious constitutional claims, say that racial trial is not a bar, and you then examine the religious constitutional claims, I would suggest to you, as Judge Ripple did in the Seventh Circuit, that there's an inadequate factual basis in this record to make any determination that the strict scrutiny test required by either the constitutional requirements or by the Illinois Religious Freedom Restoration Act applies. I don't think he suggested, though, that summary judgment was an issue, did he? Yes, he did. He said that the case should go back for development of evidence. He felt that you couldn't do it on a plea that's all, so it's in his opinion. And again, I would suggest that you get to that. And the evidence is not available or in this record because you could not do discovery? We could not do discovery, Your Honor. And again, there's a rather old joke about there must be a pony in the tunnel. They pile up a lot of material, but none of it has an ounce of evidence with regard to the critical questions that must be answered under a strict scrutiny test. And you mentioned the O'Senfer case, which was an 8-0 decision by the U.S. Supreme Court articulating what is meant by it. And it basically means that you have to show that the incremental benefit or detriment from protecting the cemetery versus destroying the cemetery is sufficient to rise to a level of compelled entrance. There's no evidence as to, one, the project, what the benefits of the project that's being built out there now are, and two, no evidence as to what the increment is between if they were to preserve St. John's Cemetery. For example, if they were to build a 7,500-foot runway instead of a 13,000-foot runway to preserve St. John's, they'd still have six runways. This is particularly important in light of the fact that they apparently have abandoned several million square feet of terminal space up there. Doesn't the ordinance, though, identify the public purpose and what this is about? Your Honor, we'll get to this. The ordinance doesn't address the strict scrutiny constitutional religious claims. That could be an independent analysis, whatever the ordinance had to say. The ordinance comes into question as to the constitutional limitations on the taking. And I think, Your Honor, one of the things that we're frustrated by is you can find cases going both ways. The Zerm case says basically that judiciary has no business looking at the ordinance decision. It's basically a legislative act, and you must ignore any claims of excess taking, more than is necessary, arbitrary capricious abuse of discretion. That's a pretty direct directive to a court, isn't it? Well, there's that case law. Then there's quite a bit of other case law, including the YWCA case, the real case out of this circuit, this district, the Lehman case out of the Illinois Free Court, which basically says, no, the courts have a constitutional obligation to inquire as to the factual basis of the legislative action to see whether or not an indeed is necessary. And again, the ordinance creates a prima facie presumption. We have no dispute about that. They put the ordinance in, and they've got a prima facie case. We're incited to rebut that prima facie case, and the case law is legion on that. We're incited to rebut the factual claim of necessity and that prima facie presumption. The only way we can do that is with this cover. That's, again, a fundamental aspect of the practice. So we didn't get that. We were basically told, oh, you've got enough. Look at the public documents. You can't look at the city of Chicago's documents. Let me go back to something you started with, and we kind of directed you otherwise. You said that this record does not have any indication that Helen or the church represented any of these living relatives. Is that because you never had a chance to present it, or it just didn't come up? As a matter of fact, we didn't know about many of these relatives. This was done well after the fact. It came to be a motion by the city of Chicago that said we want to add a bunch of people to the condemnation case. Well, we said, who are these people? Well, we gave this list. So we sent out the court directed a notice. We sent out, and guess what? A lot of people came out of the woodwork who had not been identified before and had no participation, no communication whatsoever with any of the prior litigation. So these people are the ones who are the living relatives that are before this court. So when they surfaced, when you had the list, when they were notified, what did you do to try to establish this issue of whether they were legally represented or not? Well, you remember, the Seventh Circuit case was long gone by the time we got that information. In other words, the decision had been made in the Seventh Circuit. They didn't have an opportunity to participate. They never requested that Helen Runge or the church or anybody else represent them. As a matter of fact, as you know from our brief, both the court and the city of Chicago emphasized that the church did not represent these living relatives, did not represent their interests. So they didn't have an opportunity to communicate with Runge. They didn't have an opportunity to communicate with the church. When they were brought in, her notice, after the Seventh Circuit decision, they decided to exercise their rights. Some decided not to. Obviously, several hundred decided to exercise their rights. And under tailorized projecting, they're certainly entitled. You cannot have an adequate representation claim unless there is evidence that the person who you claim to have represented authorized you to do the representation. Now, the easy way to do this, Judge, which this tailors court references, is a class action procedure. In other words, you can bind non-present parties simply by following a class action procedure. It wasn't done here. As a matter of fact, in one of our intervention petitions, we suggested to the court that they follow a class action procedure, which would bind future parties who have not been given adequate notice. But that wasn't done, and Taylor makes a very clear point. Unless you follow that kind of procedure, race and class shouldn't apply. The city seemed to be pretty adamant that we needed to add these people. Well, why wasn't St. John's adamant earlier in trying to find out who was, well, you know who's buried there, I assume. If I may, Your Honor, we tried to conduct a story. At that very point, we were denied by the city of Chicago. We specifically asked, what information do you have on who's buried and who are the relatives, etc.? We've been denied it even under FOIA. We can't get that information from the city of Chicago under a FOIA request, let alone a report of attempts at discovery. They don't want to give us that information. So we tried. We communicated with people, but I will tell you that with, obviously, some exceptions, we didn't know about several hundred of these people until they showed up, until they responded to the notice, they sent the notice into the court, and we got copies of the notice and we then communicated with them. So under Taylor v. Thurgold, as a matter of due process, we're entitled to bring our religious claims. They're not, say, identical to the religious claims that were asserted in the Federal Act? No. They're not? They are not. They are not? How are they different? One is the issue, obviously, is whether or not the Illinois Free Exercise Clause is stronger than the current federal claim. And you have to ask the question, what did the Constitutional Convention think about back in 1970 when the law was Schubert v. Vernon in the Supreme Court and there was much stronger protection? And the court has to ask the question, did the Illinois voters who voted for the Constitution, were they voting for a much weaker provision, which is what the case of the federal case is now? That's one point. The court needs to address that question. But this structure that has been imposed on us is unconstitutional from several other perspectives. Number one, the statute that gives them the exemption from the Illinois Religious Freedom Restoration Act and the Act itself deal only with the exercise of religion, doesn't deal with commercial activities, doesn't deal with private activities, doesn't deal with secular activities. It deals with the exercise of religion. And as such, because it only deals with the exercise of religion, the whole Smith test of neutrality and general applicability as between religious and secular activities doesn't apply. Second, establishment clause. And the law is clear and we're all agreed that the establishment clause under the Illinois Constitution and the federal Constitution are the same. The Supreme Court in Illinois has said that repeatedly. Under the Larson case, if the state decides to treat different religious activities differently and give some privileges to some religions and not to others, that's a violation of the establishment clause. And the city comes back and says, well, you said Larson, but what about the case of Lennon v. Kurtzman, which is a balancing test. And the Supreme Court in Larson answers that and says that only deals when all of the religions in the state have been given the same level of preferential treatment. But where you have preferential treatment as between religions, Lennon v. Kurtzman does not apply. So what you've got here is a preferential treatment. Everybody else who practices religion, the exercise of religion in Illinois, gets protected. The St. John's and the St. John's Cemetery do not. That's a clear violation of the establishment clause under both the state and federal constitutions. Even though there are no other what are called religious cemeteries within this particular location? Oh, but there are. Well, the other one that was withdrawn was Rest Haven. Yes, Rest Haven. But they tried to strip that out as well. In other words, the law was intended to strip protection from both Rest Haven and St. John's. If I may, Your Honor, I think I've covered the federal and state religious claims. What we're basically saying is that if you find that as a matter of due process, and we believe it cannot, you have to address the federal constitutional claims and the state constitutional claims as to religion. Turning to the question Justice Hutchinson raised with me earlier. If res judicata doesn't apply, counsel. I'm sorry? If res judicata doesn't apply, then has there been a finding by the trial court after a hearing on the merits for some other procedure that would supplant a hearing on the merits such that we don't have anything to adjudicate and we have to vacate the judgmentary man for a trial? That is the relief we request, Your Honor. That is exactly the relief we request. And I might add, nowhere will you find anywhere in any of the precedent submitted to you by the city of Chicago, any analysis of Ocentro and Wisconsin v. Yoder, which puts the content on what strict scrutiny means in this context, and we believe it should be developed. If I may, Your Honor. Turning quickly to the questions of the non-religious constitutional claims. I was before this court not more than a year ago in the Millinger-Bensonville case, and the court entered a ringing endorsement of the principle that the legislature cannot ignore the constitutional limitations, either the city council of the city of Chicago or the Illinois legislature, that are imposed on the power and the domain. And if you look at Zurn, and we quote Zurn, because if you look at Zurn, this court has no business looking at anything. It basically should wave its hand and say, it's not our business. But if you look at YVCA and you look at Lehman and you look at Real and you look at Giannullis, it says, and you may see the work of the city of Chicago say, abusive discretion is an example of what you can look at. Arbitrariness is an example of what you can look at. Access taking is an example of what you can look at. Now, what we've done here on the limited record, and it's probably disputed and needs further development with discovery down below, is you have a project, and I must emphasize that it's important for you to look at this project. This project is in our credits at A137 and A138. It's ultimate C. That's what it's called internally in these documents. Ultimate C, the airlines have said, we don't want it. We're not going to participate. It's not going to work. So the question then becomes, if you're only building half of the project, do you need all of the runways? Do you need all of the runways that would destroy San Johannes? Or is there something less? And I would suggest to you that the YMCA case, as well as the Powell's case, both say that when the evidence before the trial court establishes that you don't need it all, that you need less than the whole, less than that claim, you're entitled to relief. That's a constitutional limitation. But, counsel, aren't we talking really about runway 10C-28C and that runway being essential no matter what happens with the terminal 2, decreasing the delays for the airlines and O'Hare generally? If I might, Your Honor, the United Airlines filed an amicus brief in this case and said we want 10-28C because we've endorsed quote phase one. Now, we've alluded to the fact that there's been a lot of name changing around here as to what projects are. I would direct your attention to the record item that we filed in opposition, in response to their motion for accelerated oral argument, in which we cited the fact that they're not building phase one out there now. They're building a piece of phase one. And there's no evidence in this record that phase one will produce any level of delay benefits, including any evidence in this record as to what would happen if San Johannes was protected. Absolutely not. And if you look at the attachments to our plea that we filed here, you'll find that the United Airlines is opposing the people mover, the United Airlines is opposing the satellite terminal, the United Airlines is opposing several elements of phase one, which were the basis of the claim that there would be delay standards. So you have a very incomplete record here. I might want to come back to something else, which is I think we would appreciate some instruction on from the court. It was very clear in discovery, the limited discovery that we had in this and other cases, that the executive branch of the city of Chicago was exercising discretion as to what projects to build or not to build, what land to acquire or not to acquire within this big geographic envelope. We saw discovery happen. The city of Chicago responded by saying, wait a minute, the Brown Family Trust case of this district of Pelham says that that would be prohibited. We have to take it all. We have to buy it all. Now, if you look at the previous appeal, you'll find that the IDOC says, no, wait a minute, there can be a delegation from the legislative branch to the executive branch to make those decisions. We said we don't care who it is. We want to do discovery with the legislative branch, or we want to do discovery if it's the executive branch. But if it can be the executive branch, we want to do discovery on that decision. If it can't be, if there is a constitutional limitation on that, then we want to do discovery to determine whether or not an entity has been conferred, and if so, under the construction of the Brown Family Trust, it would be unconstitutional. We've actually been barred from discovery under either end. The irony of this whole thing was that we had a traverse hearing, in which at the end of the day, we had no evidence. We couldn't get at the internal evidence of the city of Chicago. So the circuit court said, well, look, we have a statement here by a city of Chicago employee. We have the ordinance. And, by the way, that allows the basis of a crime prevention case, and you haven't done anything. You haven't put it on your proof. You didn't have any opportunity for discovery to put on your proofs. Let me turn, if I can, to the last point, which is central to this question of what's the project. The statute is very clear that says if you want to do a court take, you have to submit as part of your motion for a court take an identification of a project and a project schedule. What's the project? The project is alternative C. That's what they say. They admit it repeatedly. Alternative C, which is the big project. Where is the schedule for the big project? It's nonexistent. Why is it nonexistent? It is our position. It's nonexistent because it doesn't exist and it won't exist. So, at a minimum, a statutory compliance with the mechanics of the statutory requirements for a court take, they refuse to do it, and the court let them get away with it. We think there are, under any circumstances, this case ought to be remanded for a trial by the court, discovering a trial by the court of the religious constitutional principles. And I might add, I just want to emphasize this term again, courts are reluctant to make judgments about religious protection. It's messy. The O'Sentral case makes it very clear that's the job of the courts. If you look at the Illinois River Statute, that's what the legislation said in the Illinois River Statute. It is the courts who will make the decision as to whether or not there's a compelling need or not a compelling need or whether or not this religious practice can be protected. We ask the court to give us the really true request. Thank you. Thank you, counsel. You will have time to rebuttal. Ms. Sullivan. Good morning, Your Honor. I'm Ms. Sullivan from the city of Chicago. And may I please support? The city began efforts in earnest to expand and modernize O'Hare Airport in 2001. City Council approved acquisition of more than 600 properties. The General Assembly amended more than a dozen laws to eliminate state law obstacles to expansion. The FAA approved the airport's revised plan. Protocols were developed for relocation of St. John's Cemetery and both the D.C. Circuit and the 7th Circuit Federal Courts of Appeals rejected objections by St. John's Church and two of its members to relocation on numerous federal law grounds, including several revision claims. Counsel, if you would be kind enough perhaps to turn to the Taylor case. In your brief, you indicate that that case, in your view, is inapplicable. Would you elaborate on that, please, and let us know why you do not think it applies here so that the interveners can have their day in court? Yes, Your Honor, I'd be happy to. There are two reasons that we give two different pieces of the analysis of Taylor. The first piece is that Taylor does not concern at all an entirely separate ground of decision that the Circuit Court relied on when it considered each of the petitions for intervention and when it considered the Anderson complaint as well. In each instance, when we cite the pages in our brief, the Circuit Court ruled that the relatives would be allowed to participate, that they would take the case as they find it. That was not a res judicata ruling. The Court did make a res judicata ruling in some instances, but that was a stand-alone ground based on restrictions on intervention. Taylor does not address state law, the ability of state courts to control their documents by placing conditions on intervention. Is this an intervention or is this a point of necessary parties? The petitions, the first two petitions brought by the relatives were actually filed as intervention petitions. The Andersons, although they took an extension of time in order to appear, they then filed a separate action. So in our view, they don't have the rights even of intervenors. They certainly don't have greater rights than people who actually presented themselves in the eminent domain action. But it doesn't matter whether they're regarded as intervenors or joiner of necessary parties. The point is that at the time they came forward, the city's complaint for condemnation, which was filed after an ordinance was enacted that was legislative process to the entire world, that the city was attempting to acquire the cemetery. That was in 2002. This has not been a secret that the city was needing to acquire this. When the FAA's decision was reached, that was well publicized. The church has publicized this in its newsletter. Perhaps there really were people who had no idea the city was attempting to acquire the cemetery, but they were named as unknown owners in the complaint for condemnation, and that complaint was published, which is appropriate when there are unknown owners. The city, though, apparently had knowledge of who these living relatives were and did not seek to do anything about it until we got it to the state court. Why was they brought into the federal court? With respect, Your Honor, the church has been very protective of its records. When we were doing the discovery on this, and we had requested, of course, to guard in at Lydom because there were interests which could not be protected by the church. The church did not want the graves relocated, but we were well aware there were people who did not object. There have been 28 disinterments already on a voluntary basis, and there are nearly 70 other requests pending. So it is not the case that everybody objects, but the church did not wish to make those records available unless the city agreed to a protective order, and so eventually the matter was put before the circuit court. They were not made parties in the federal litigation because we were actually defendants in that litigation. That litigation was brought by the church and two of its members. They had the records, and that was not an imminent domain case, so certainly it was not required for the property interest purposes, for due process purposes, that everybody with an interest in the cemetery be a party to that case, and so they weren't. We have made great efforts to identify relatives. We have published in the newspaper. We have worked with the special master, and eventually a large number of relatives were identified, and they were given notice. Now, in response to those notices, some relatives did come forward, but the circuit court's ruling was, fine, you can participate, but with a project of this kind, which the General Assembly found must be done on an expedited basis, and the project being proposed in 2002, the runways being approved in 2005, the complaint was filed in October of 2007. Now, by the time the first set of relatives appeared, it was 10 months after the complaint was filed. The circuit court ruled in the exercise of its discretion that they could participate, but they couldn't redo things that had already been decided. Now, again, back to Justice Inouye's specific question, Taylor does not limit the ability of state trial courts to control their dockets and prevent literally hundreds of people coming in one after another, up to two years after the complaint was filed. The Anderson filed their complaint two years with a project of this kind, years in the planning, millions of dollars in the planning, reviewed by a large number of federal courts, FAA administrators, the city council, the General Assembly. Everybody agrees this project must move forward and with expeditions. So the only thing the circuit court barred was a redo. We're not going to rewind the tape here. We're going to move forward from this point on. Taylor does not speak to that. Of course we don't doubt that Taylor does not speak to the separate ground on which the circuit court limited the rights of the relative to re-litigate religion claims. The word intervention and conditions on intervention simply don't appear in the Taylor decision. Taylor concerns the second ground on which the circuit court also limited participation, re-raising of the religion, not participation, excuse me, re-litigation of the religion claims, and that's race to the title. Now, in our brief, and I'm sorry if we were not clear on this, we don't argue that Taylor is inapplicable. In fact, we rely on several of the exceptions that Taylor recognizes. What Taylor held is that the very expansive notion of virtual representation that some federal courts had engaged in, including the D.C. Circuit, in that case in front of the courts, the court ruled that some of that vast expansion of the doctrine did not comport with due process. But in doing so, the court actually recognized six settled exceptions, all of which are a kind of virtual representation. In none of those six instances is the party before the court at the time race to the title is found a party to the prior proceeding. So each of them is a kind of virtual representation, and the court does not say virtual representation and doctrine in state and federal courts in this country is gone. Let no one ever speak of it again. All right. Now, with regard to the exception for a substantive legal relationship, you don't discuss the aspect of legal relationship. You talk about in your brief there was a substantive relationship because there was a sharing of common religious beliefs. How do you respond? I asked counsel that question. How do you respond to that? We give two reasons for that, Your Honor, and, again, we were attempting to work within that exception, not to change the exception, so I'm sorry if we weren't clear. We do recognize that the law requires a substantive legal relationship, and in this case we say that exists for two reasons. The first is that when the church and two of its members litigated in the federal court, the church asserted the religious claims that the relatives advanced. The church as an institution has no religious beliefs of its own. When it said we believe secular entities should not own consecrated ground, we believe the bodies of the dead must not be moved, it was making those claims on behalf of its members, and those are, in fact, the same exact claims that the relatives made. And, of course, two members were actually parties in that litigation. But wasn't St. John's told that you cannot represent those beliefs, someone else has to do that? I think Your Honor is referring to a statement that was made in a very different context in this case. In the motion for appointment of a guardian ad litem, the city pointed out that St. John's does not and cannot represent all of the relatives of persons buried at the cemetery. Now that is a true statement. St. John's has actually never claimed that it represents all of the relatives, and on St. John's we know that there are relatives who do not agree with the religious beliefs that St. John's and other of its members, and the relatives here, have proffered. So that statement simply reflected that there are diverse property interests between St. John's as the owner of the feet and the owners of the easements, namely the dead and the relatives of the dead who are buried at the cemetery. And that's the second piece, just as enough, of the substantive legal relationship. These are not concurrent property owners. Counsel is really enamored of that paragraph in the statement, but it doesn't apply here. These are not concurrent property owners. The easement holders own derivative property interests in the cemetery. What they own the cemetery does not own any longer. The cemetery has granted easements. And this is well-fettered in cemetery law. We cite two cases, the Smith case and the Brown case, in a footnote in our brief responding to the claims for the injunction. So this is very well-held law in the area of running a cemetery. But again, that's why the statement was made in the motion for appointment of the guardian as liable. We certainly do believe that at least three of the exceptions in Taylor apply here. And certainly when they are put together, what the court will see is that the church litigated religion claims professing the same beliefs that the relatives assert here. The relatives, but conversely, hold derivative property interests in the same property that the church is seeking to protect. Would you summarize what the three exceptions are that you think you need? Yes. They're not brief as well, Your Honor. They are the substantive legal relationship. And what substantive legal relationship? Correct. Meaning the property relationship between the church and the easement holders. Okay. And when the court describes the substantive legal relationship, I know Your Honors have looked at the Taylor case, but it actually describes substantive legal relationship in terms of property interest. So that's what we're dealing with here. The second is the adequacy of race. Not just the adequacy of representation. Of course, the relatives are all represented here by St. John's Council. There's no question that the relatives think there's a commonality of interest with the church, and they're comfortable with counsel. They have filed one brief. The church has actually solicited participation by the relatives in this case. We cite those pages in our brief and have made clear that it will pay for representation. And it has used its own counsel to do that. So there's a whole web of interrelations between the members and the church, and for that reason we do say that they are a proxy and an adequate substitute. It's interesting, too, that there was not a claim for intervention despite the publicity of the acquisition, despite the publication of the complaint as required under eminent domain law. Despite this, no relative came forward until St. John's Traverse was denied. Not even then, three months, four months later. So there's a very interesting relationship between the relatives and the church, and there's no question that when the church professes religious beliefs, it is speaking for those of its members and those who are buried in the cemetery who share its religious views. And the third one, of course, is this proxy idea. So we have adequate representation, substantive legal relationship, and the proxy. But we're not relying on them individually, of course. When a court considers due process, it's really a totality of circumstances. How do you respond to counsel's statement that the claims actually are not the same? Oh, that's because they just didn't raise all of the right claims in the federal litigation. But that's never a defense to res judicata. The fact that the first party doesn't, you know, raise all of the claims that might be raised on the same transaction. Res judicata bars claims that were raised or could have been raised. I'm sorry. I was under the impression that you earlier indicated that res judicata was not the ruling the trial court made. The trial court rule was it had control of the court. And for purposes of intervention, it determined that the interveners would take the case as it existed at the moment that they intervened, which is not the same thing that you said, or I should say you said. That is not the same thing as res judicata. So why are you now saying that res judicata, which you didn't say, but you're arguing, results in collateral estoppel relating to issues not raised that should have been raised, will either be estoppel by judgment, collateral estoppel, which will then be res judicata. So would you please clarify for me, at least, what did the trial court rule? Did the trial court rule that it was res judicata? Or did the trial court rule that it's law the case as it exists at the time the parties intervened? I'm really sorry if we haven't been clear on this, Your Honor. I can clarify it very, very simply. The circuit court ruled with respect to each of the requests by the relatives, the first round of interveners, the second round of interveners, and the Anderson plaintiffs, when they were consolidated. This is on page 15 of our brief, and the citations are at page 730, 1218, and 2540. The circuit court ruled with regard to each attempt by the relatives to re-raise the religion claim that they would have to take the case as they found it. We don't think that's really properly called law the case. We have analyzed it as a restriction on intervention, or in the case of the Andersons, since they didn't even bother to intervene, certainly they have no more rights than the people who did. So you're saying then that if you intervene and the issues raised are constitutional, you cannot raise constitutional issues as opposed to non-constitutional issues? No, I'm sorry, Your Honor. It's not a question of constitutional or non-constitutional grounds. The issue is, have the issues been litigated before the interveners presented themselves? Because this is a project, as I say, that everybody who has looked at it in a reviewing capacity has determined is necessary and must move forward expeditiously. The church and the relatives had an interest in delaying moving the cemetery as long as possible. So the circuit court is entitled to take that into account when it evaluates the delay that the relatives showed the undue delay before they presented themselves to the circuit court. Now, that ground is common to all. In addition, we did argue race judicata on all three occasions, and the circuit court did embrace that on two, for the second set of interveners, of course, because Helen Runge was actually a party to the federal litigation. You know, with her, it's not a question of virtual representation. She was actually a party to the Seventh Circuit case, and there's never been a claim here that any of the other interveners, any of the other relatives, have any different interests from Ms. Runge. So, again, that was a separate ground of decision, but my point simply is that they are separate procedural grounds. Taylor speaks to one but not the other. We don't doubt that intervention has to be done consistent with due process, but all of the rights of unknown owners who don't present themselves to an eminent domain court or don't present themselves timely can be cut off. That's the whole point of naming unknown owners. That's the whole point of publication. And that's really all the circuit court said here. I would, with respect, since there were quite a few questions. I didn't really know, but supposedly the Church found out who they were based upon your disclosure of who they were. I think that might garble the procedure a little bit, Your Honor. We filed a complaint naming unknown owners, as is common with an eminent domain complaint. And then the complaint, of course, was published as required. So when people are unknown, of course, publication is sufficient for due process. The U.S. Supreme Court has said that repeatedly. So at the outset, these people come in with notice. And then what the circuit court said is, you know what? Ten months is too long. Two years is too long. I'm done with religion claims. Those were decided when I decided that St. John's religion claims are res judicata. That was the treatment of religion claims. It wasn't on the merits, but it was a treatment of the religion claims. And that's what the circuit court ruled. Now, on the religion claims, in the interest of time, I would like to start with the Free Exercise Clause claim under the Illinois Constitution. And we argue that it should be construed in lockstep with the Smith test that now governs free exercise claims under the federal constitution, as both of the decided Illinois appellate court cases have held. The Illinois Supreme Court has also found lockstep for the Establishment Clause. And while we recognize, of course, that it hasn't specifically addressed the free exercise clause under the state constitution, nonetheless, the legislative history, the convention statements by the delegates, it's exactly the same snippet, a very repeatedly hedged and speculative statement, well, maybe there might be something, maybe just a little bit more here. It's the same statement. The delegate lady is not specific, whether she's speaking of the Free Exercise Clause or the Establishment Clause. And nonetheless, the Illinois Supreme Court tells us that the Establishment Clause is in lockstep. So our submission is that if the history is not sufficient to show that the Establishment Clause should depart from lockstep, it's not sufficient to show the Free Exercise Clause should either, because it's actually the same one snippet of a statement at the constitutional convention. Now, with regard to an incremental analysis, how do you respond to Counsel's point that one should have been done? And you indicate in the brief that neither Yoder or Centro entitled the appellant to an incremental analysis. Can you elaborate on this, please? Yes, Your Honor. And, of course, this is a claim that St. John and the two other members who litigated in the federal litigation have been making forever. This is the claim they made to the D.C. Circuit. This is the claim they made to the Seventh Circuit. So the courts have actually addressed that claim. The reason we say that Yoder and O. Centro don't require an incremental analysis here, and when I'm finished with my answer, Your Honor, with permission, I just want to back up very, very briefly to summarize what the FAA did find, because it's very, very important here. The reason more of an incremental analysis, I should say, was not required, is that both Yoder and O. Centro dealt with government programs that could actually tolerate exceptions. And that's why it was important to know, is it going to undermine the system of free public education to age 16 in the state of Wisconsin if the Amish children are allowed to leave school at 14? That claim was not even made by the government in my case. And, of course, it wouldn't. And the same is true in O. Centro. Is it going to undermine enforcement of all the laws against peyote if Native Americans are allowed to use the drug for sacramental purposes? So the point is that when the government program can tolerate exceptions, it is, of course, appropriate to ask, what is really gained in achieving a compelling governmental interest? Do you really have to include the religious objectors in the government program? Now, that simply is not true of the O.M.P. The FAA made very clear that without Runway 10 Center placed, not only without it entirely, but without it placed exactly where it is, the O.M.P. is simply not the O.M.P. It's a different program. Well, why couldn't it be shorter? It can't be shorter because it doesn't carry the big aircraft, if it is. They have to be staged out for sequence landings at something like 40 miles out from the airport. And potentially in bad weather. It's not that it can't be done. The FAA believed it could not safely be done. And when something can't safely be done, they just take it off the table. That's why they say it's feasible. You could, of course, build a shorter runway. We could build no runways. That's feasible also. But building a shorter runway, moving the runway, not building any runways, these don't address the problem. The government is never required to settle for a least restrictive means for something that doesn't advance the compelling interest that it's actually attempting to address. The FAA's findings, I'm sorry, just one more word on Yoder and Accentra. It can be very easily analogized to, for example, a screening program where everybody in this country now is entering a sensitive place. Whether it's an airplane or a courthouse or a variety of other sensitive places. Every person must pass through a metal detector. You can't just exempt one religious objector from that. And there are probably religious objectors who don't want, you know, the waves going through their bodies. And they do believe that in all conservatives. But you can't exempt anybody from that program because then it stops being a comprehensive screening program. Well, the FAA did. You can ask to be hand-searched. But the point is, everybody has to be searched. I guess that's my point. And so, there is... And how can you get searched? Correct. But the point is, my point is simply that there are some government programs that cannot tolerate exceptions or they just stop being the program that the government wants. Ms. Sullivan, can I ask you a question, please? I asked Mr. Karagannis if he believed that there were controverted issues in fact. Do you believe that there are or do you believe that there are not? There are not, Your Honor, for two reasons. On the religion claim, the reason there are no controverted issues, and this was the back-up that I was going to make to Justice Dino, is that the FAA's analysis, and we do commend it to the court, it is on pages 97 through 103 of the FAA's record of decision. That decision can be found. We give the court the citation in our brief. It's on the city of Chicago's website, on the aviation website. It is a matter of public record. The court can obviously take judicial notice of that document. The FAA examined more than a dozen alternatives, some supplied by St. John's and its members, others constructed by the FAA itself. The FAA found that not a single one of them performed anywhere close to as well as the OMP which it selected for the city. In fact, the five best performers, and we do explain all this in our brief, C, D, E, F, and G, I believe, they all required taking the cemetery. Without the cemetery, the FAA was very clear. Six parallel runways simply cannot be constructed. O'Hara came in not just by the residential developments on some of its sides, but by major expressways, by railroads. That diagram is on A1 of our brief. Again, the space just isn't there. If you look at Term Center, you can visually try to move it. There's just no other place to put it. That was exactly what the FAA said. Now, that decision doesn't actually matter for purposes of that finding, whether we're building the terminals or not, and that's because the terminals aren't in the way of moving Term Center. The problem with moving Term Center is the length and width of the runway. There's just not another place to put it safely and still build six parallel runways to handle up to four arrival streams. Term Center is a crucial runway to this airport, and the FAA made that specific finding when it granted $330 million in federal money for the runway project. The FAA found it on page 813 of our brief. The FAA found it is valid even if nothing gets built besides these first three runways. With respect, we think it is simply not open to this court to reexamine the findings of the FAA. The FAA is the only expert agency in this country that is empowered, authorized, and competent to locate runways. And because the FAA decision is not under review here and cannot be under review here, we think there is simply no discovery as a matter of law that can or needs to be done on the religion point. Because the FAA actually assumed that strict scrutiny was the applicable standard. In the interest of saving time for this terribly important project, the FAA did a full-blown strict scrutiny analysis. And, alternatively, the OMP passed that analysis in the view of the FAA. The FAA explicitly found that the plan, as permitted by Chicago, leaving aside rest homes and cemeteries, was the least restrictive means to achieve a compelling governmental interest. Now, whether or not this court finds lockstep, and whether or not this court finds that under the federal free exercise claim that the LMA is a neutral law of general applicability, if this court rejects those arguments and moves past to the religion claims, the free exercise claims, on the merits, the question in front of the court will be whether the city's plan is the least restrictive means to achieve a compelling governmental interest. We say the FAA's decision is final and conclusive on that issue. And for that reason, discovery is simply not necessary and not appropriate. And that finding by the FAA, I should add, is the Seventh Circuit, albeit as an alternative holding, did reach the same conclusion when it examined the same FAA decision. It found that the FAA had gotten that issue correct. So this issue has actually been vetted several times. If there are no facts in dispute, of course, there is no need for discovery and obviously no need for a remand. If I understand, I don't want to say if I understand. It appears as if you were saying to us that the federal district court and the court of appeals determined that the FAA finding was as a matter of law binding on the federal government for purposes of its analysis regarding federal rights, duties, responsibilities, and liabilities. And as such, we should apply the same standards and we should determine as a matter of law that the FAA findings bind to the state of Illinois as they found the federal government. Let me see if I can do this really simply. Obviously with four and a half years of litigation by the church and its members, some of the cases do start to run together. So the FAA decision was taken on review as allowed by federal statute to the D.C. Circuit Federal Court of Appeals. That court ruled, rejected all of the challenges by the church to claims that the FAA had not done an adequate analysis, that it was biased, that it hadn't modeled the various alternatives properly, it rejected all of the administrative law challenges. It also rejected the religion claim by the church, but not on the basis that it comported with strict scrutiny. Rather, the D.C. Circuit says strict scrutiny does not apply because this plan is the city's plan. The Seventh Circuit, and this is another case brought by the church, that case did start in the district court. The district court dismissed the complaint and the Seventh Circuit affirmed. The Seventh Circuit specifically ruled that the RMA is a neutral law of general applicability that raises no free exercise claims because any burden imposed by a neutral law of general applicability is simply not cognizable. We do urge that result in this case as the first step of analysis on either the federal free exercise claim or the state free exercise claim if it is in lockstep. The Seventh Circuit also rejected an equal protection claim. The Seventh Circuit specifically found that the RMA did not target religion. This is the reason that we give for why the Establishment Clause claims fail. And, of course, on the Establishment Clause there's no dispute that the state constitutional provision is in lockstep with the federal constitution. The Larson case, which Mr. Kerrigan relies on, deals with a targeting of religion. But, you know, if you pick the religious piece out of any statute, it's very easy to find targeting. But you don't do that. You don't isolate one provision. You don't isolate the amendment to Illinois Red Cross from the entire suite of repealers that the RMA enacted. You look at the statute as a whole. That is a subtle canon of statutory construction. You also look at the statute for status. And, of course, if there's a way of viewing the statute so that it doesn't target religion, that's the appropriate way to view it. But the Seventh Circuit's equal protection holding is directly applicable to the Establishment Clause issue here because there simply is no targeting. Now, our argument is not that the federal courts looked at the plan only with regard to the federal agencies. Our argument, and I do say this with respect, is that the FAA's decision is not under review in front of this court. Those petitions for review cannot be brought to a state court. They can only be brought to the federal courts of appeal. They can only be brought within 60 days. And the rod was issued in September of 2005. So, obviously, there's no jurisdiction for the court to review it for a large number of reasons. But neither can people who have the opportunity to participate, who did participate through their church in that litigation. People can't come in four and a half years later and say, You know what? We think you should really take a hard look at what the FAA did and how the FAA did it and what the FAA decided. Because we think it should have done an incremental analysis. We think there really was another place to put Tennessee on the airfield. The FAA says this is the only way to do it, to achieve a compelling governmental interest. The next closest alternative to this one had 19% more delay. And it took the cemetery also. The third best had 81% more delay. And it took the cemetery also. The five top alternatives in terms of how they actually performed to reduce delay, they all required taking St. John's Cemetery. People have looked at this. The church looked at this. The church submitted designs that did not require the cemetery but also did not address delay. The reason the FAA did not model them is because they performed so badly that they were behind the top five performers, one of which is 81% worse than the one the FAA adopted. Now, the D.C. Circuit and the petition for review does go through. It says the FAA's treatment of the issues for administrative law participants was adequate and that petition was dismissed. So we just think it's binding now. It can't be collaterally attacked. The FAA's decision is binding. Are you saying that if the federal lawsuit had not been instituted, that the state trial court would not have considered the FAA findings, rulings, recommendations, or whatever? No, I'm not saying that. I'm also not saying that if it hadn't been reviewed, it would be open in this court because, of course, there's a time limit. If there had been no review, it would be just as binding on the entire world as it is because it was reviewed. My point is it really is more of a focus on the expert agency's decision because the FAA is actually the entity that locates runways in this country and it exhaustively studied more than a dozen alternatives. The church simply didn't submit an alternative that didn't take the cemetery, but wholly failed to address the problem of delay. And for that reason, they don't meet the compelling governmental need. And as I mentioned, the government is never required to accept, on some theory of least restrictive means or incremental analysis, a program that actually doesn't serve the interest that it is trying to serve. When you say government, would you identify what specific government you're referring to? All governments. The city of Chicago, the city of Wheaton, the state of Illinois, the U.S. government, all four. The free exercise clause does not allow any individual, no matter how sincerely he or she holds religious beliefs. And we haven't questioned the sincerity of the belief here. We have argued that it's not a cognizable burden because there's no religious practice that it interfered with, but only a variety of religious beliefs. Of course, government does not have to honor people's religious beliefs. Government probably offends someone's religious beliefs every single day. Government offends people's religious beliefs when it goes to war. Government probably offends religious beliefs when it doesn't go to war in circumstances that people think are morally offensive. The point is that the government, and this is all levels of government, this is directly under the First Amendment itself and directly under the state constitution. The government does not have to accommodate itself to religious beliefs, nor even does it have to accommodate itself to a religious practice when exempting a religious believer from a generally applicable program wholly undermines that program. So our point at the end of the day on the religion claims is that the state free exercise claim is the same as the federal free exercise claim if the state constitution is in lockstep. And if it is, if it's lockstep all the way, it's not lockstep in 1970, that would not be lockstep. It's lockstep today, as both appellate court decisions have felt. That means that any neutral law of general applicability is valid even if it imposes a burden on religion. Do you believe there are any controverted facts as to whether or not taking is necessary? Thank you, Your Honor. That was the next thing I was going to address, next and last, I might add. On the issue of necessity, we also do not think that there are any controverted facts. And that's because the cemetery party, St. John's was included for purposes of the eminent domain claim, the cemetery party do not doubt that we are actually building run by 10 fellows. And it was testified to at the travelers' hearing. We have begun building from both ends. Concrete is going down. The engineering is done. The missing piece is the cemetery. But, of course, that's why we're here. They also don't dispute that 10 fellows is actually necessary for the project the city is actually building. As I understand their argument on necessity, it is that the city wouldn't need 10 fellows even if we're building a different project. If we were willing to move runway 10 fellows, for example, we wouldn't need the cemetery. But that is not a recognized defense under Illinois law. And for that reason, it fails as a matter of law. Discovery is not necessary on that issue. There's a long list of cases to say the courts will not consider whether there are alternative designs, alternative locations, or any other alternatives to the project the government is actually building. We cite the Lewis case and the city of Elgin case in our brief, and they are directly on point on that issue. There is also no dispute that the very extreme cases, in our view, no applicability for the very extreme cases that the cemetery parties do rely on on this issue. They rely on the YWCA case, and they rely on the Faust case. Now, in those cases, it was actually possible to say that the property was not actually necessary for the project the government was actually building. That not only cannot be said in this case. A close reading of the cemetery parties brief will show that they don't make that argument. They didn't make it below us, and they don't make it now. They do not dispute that we need the cemetery property for the project we are actually building, and that automatically excludes the YWCA case and the Faust case. The sovereign has the right to decide where to locate property, and absent a grossly excessive amount of property or a clear abuse of discretion, the courts do not sit to review that judgment, and this is not even a close case. In this case, it is really quite clear. The diagram A1 of our brief makes clear that Runway 10 Center needs the cemetery property. We would rely on our brief for the rest of the issue. I have one other question. Yes, sir. Mr. Caragana said that a quick date should not apply here because you didn't provide a sufficient schedule. I believe what that argument is is that because the runway project is part of a larger project, that we needed a schedule for the entirety of the project. We do also cite in our brief several cases in which that kind of claim is also rejected. The Kelo Department of Transportation against Kelo, City of Chicago against First Bank of Oakland Park. These are all cases in which one piece was settled. The government needed the property. There might have been other pieces that weren't yet firmly in place. There might not be a schedule for everything, but there was unquestionably a schedule for Runway 10 Center. In fact, we're long overdue now, but that was testified to at the Traverse hearing. I think if you were to push Mr. Caragana from this issue on the bottom, he would tell you that what he really means by that is not that there was no schedule for 10 Center, and of course that's the only property involved in this case. The cemetery property is the only property at issue in this case, and that is why the motion for immediate best interest title could limit the schedule for testimony at the Traverse hearing could be limited to the 10 Center project as a piece of the larger project. But I don't believe he will tell you that we have no schedule for 10 Center. Thank you very much for your indulgence, and we would ask that the Court accept the judgment. Mr. Caragana. If it pleases the Court, in listening to the comment with my esteemed opposing counsel in the Court, Taylor, the Court asked about the six exceptions, and as the comment was going on, I pulled Taylor out and got the six exceptions. And nowhere does Ms. Toliman tell you which of the six exceptions apply, because they don't. None of them apply. I looked through each of the six, but the fact is they don't. Here's what she says are the three she finally relies on, a substantive legal relationship. Nowhere in the restatement's second of judgments does the fact that people share religious beliefs constitute a substantive legal relationship. Accuracy of representation, the Court deals with accuracy of representation at page 2171, and says the way to deal with accurate representation is class actions or special relationships such as trustees, guardians, and other fiduciaries. It has nothing to do with the fact that they share a common religious belief. And the last one is that she says the Church has solicited participation in the litigation. Again, one, is to many of these people we have no knowledge of. The second, that's not a ground under Taylor v. Thurgood, even if it had occurred. I might emphasize that Taylor, one of the things the government argued was, gee, the counsel for the first party is the counsel for the second party. Doesn't that show a close relationship? Of course, that doesn't count. That doesn't matter. And finally, the Court, I don't want to be very clear on this, is virtual representation. We quote on our record, the Court said specifically at 2167, we disapprove the doctrine of preclusion by virtual representation. Absolutely flat out. You have to show the very specific exceptions. Now, I've heard a lot of talk about the FAA and the D.C. Circuit, and we've been there, et cetera. We did go to the D.C. Boy, we've gone to every court we possibly could to get belief here. You know what the D.C. Circuit told us? This isn't the FAA's project. The FAA has nothing to do with religious protection. This is the city of Chicago project. You've got to compete against the city of Chicago? Go take it somewhere else. So we were thrown out of the D.C. Circuit saying this is not a federal project. The destruction of the cemetery is being done by a state or local government. So the fact was that the D.C. Circuit didn't decide the relational question. On the question of whether or not strict scrutiny applied, there was only one judge on the D.C. Circuit who addressed it. That was a dissenting opinion in that case. And he said we haven't seen enough evidence in this record to say that the strict scrutiny test has been met. So let's put the D.C. Circuit to bed. Going back to Ms. Solomon's point regarding intervention, would you respond to that? Yes, if I may. A two-separate argument with regard to the security of the city. Right. She said that Taylor is one of our arguments. Right. The court could have used the intervention power that the court had under 735 ILCS 5-2-408 to condition, to essentially bar people from raising their constitutional claims. I suggest respectfully that that intervention statute and the control of that cannot be used as a bar to bar the constitutional rights of anybody. Essentially, that's a backdoor way of avoiding Taylor v. Thurgood. And I might add, neither did Judge Webster. Because Judge Webster said that she recognized in her 416 order that Calander's order, while law of the case, did not bind interveners as to their constitutional claims, and she then went ahead and conducted a ratio to conduct analysis. So she recognized in her 416-09 order that simply trying to condition intervention would not be a proper mechanism for barring people's legitimate constitutional claims. I want to come back to something which Justice McLaren raised. There is nothing in the material before this court that tells you whether the delay reduction that would occur as a result of saving St. Johannes, the difference in delay reduction, is 10 seconds, 10 minutes, or 10 hours. Not an iota of evidence. Ms. Solomon referred to a number of studies the FAA did. It was all destroyed, all of their alternatives destroyed St. Johannes. And they listed their methods. We've asked, as we have the dissenting opinion in the D.C. Circuit, we've asked, if you save St. Johannes, what will be the effect on delays that will occur? Those six runways, one of them short, remember, as we've stated in the record, there are three 7,500-foot runways. What will be the effect on delays? Nowhere in this record is there any indication. And that's what Ocentro, and that's what the owners say the role of the judiciary is all about. How much of an exact increment rise to the level of compelling government relief? If it's 10 seconds, it may not. If it's 10 hours, it might be. That's what you need to develop a record on. So the FAA's analysis doesn't cover that? No, not a bit. But it does cover the issue of different delay based upon different proposals, correct? It doesn't give any information on the delay that will occur if you save St. Johannes. It simply engages in qualitative statements that are referenced in Ms. Solomon's brief about, gee, there would be greater delays. But at no point is the court in a position to say whether that's 10 seconds or 10 minutes or 10 hours. Well, it's one thing to say that the report doesn't say that if St. Johannes was removed and preserved that this is what the amount was. But could there or was there a determination made that, for instance, shorten the runway or remove the runway and that would indicate what the increase in delay was? In other words, you don't have to specify what the animal is that's in the bush that's making the noise to recognize the fact that there's an animal in the bush Would there be a difference in delay? Absolutely. What is that difference in delay to make the judgment as to whether or not compelling strict scrutiny test has been met? The answer is no. And I might add, we point this out in our brief, there are two alternative factual scenarios we put. One is, let's assume they're building a big project, which is what they said they were doing. What's the difference in delay if they built a big project in the state of St. Johannes? But let's turn to the other set of facts. It is undisputed in the record that the airlines have told the state of Chicago, and the state of Chicago for all intents and purposes, that Pearson will abandon the terminals. These terminals, all this talk about prices and we've got to build, we've got to build. Back in 2001, 2002, they hadn't finished design on the terminals, let alone construction. So the terminals are sitting idle, sitting empty. Two and a half million is working. So the question is, if they're not going to build the terminals, how many runways do you need? Five, six, ten, twelve? Again, that's a question that goes back to the earlier question. Independent of the religious issues, is there a set of facts that need to be explored with regard to necessity? And again, based on what we know and based on the records we have before us, yes, both on a religion basis as well as other constitutional basis. Since the city of Chicago, according to the D.C. Circuit, is the entity making the, doing the condemnation, can the city of Chicago simply adopt the FAA record or report and say, accordingly we have now done our strict, we've complied with strict scrutiny? Well, again, if the FAA does strict scrutiny, the first question is, did the FAA do strict scrutiny on St. Thomas? And the answer was no. You will not find a mention in the FAA analysis of either El Centro or Oriole, period. So they didn't do an equity analysis. The second, and this goes back to, we suddenly at the Trevor hearing get what appear to be at the minimum several hundred, but we more likely have several thousand pages of FAA material put in the record, without putting the FAA author of the document on it, without providing an opportunity for cross-examination, without providing any opportunity for discovery. The city can't come in and say, here's a report that we have. It's loaded right with conclusions and opinions and analysis. And by the way, you can't cross-examine it. You can't get the author. We can simply put it in as a quote-unquote governmental record. That's not the law of this state with regard to that information. If the city isn't going to be the actor here, we're entitled to discover as the city. If the city wants to put out a witness who will make the same statements that the FAA makes, we're entitled to take that witness's deposition, do discovery with regard to documents, and then put out our counter-witnesses and have the court make appropriate triangles. That hasn't been done here. There are no problems. We sit here in a situation where, at this point in time, the courts have been reluctant or unwilling to address their constitutional responsibilities with regard to the protection of religious rights as well as with regard to the enforcement of constitutional limitations with regard to the issues of necessity and abuse of discretion. We believe that the appropriate course of action for this court is to remand for discovery or trial on the religious constitutional issues as well as on the necessity and abuse of discretion issues. Thank you. Thank you very much, counsel. At this time, the court will take the matter under advisement and record a decision in due course.